[Cite as *Short v. Rhodes*, 2021-Ohio-1845.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Tonya Short                                    Court of Appeals No. WD-20-066

　　　　Appellee                               Trial Court No. 2014-DR-0120

v.

Mark J. Rhodes                                 **DECISION AND JUDGMENT**

　　　　Appellant                             Decided:　May 28, 2021

* * * * *

Stephen M. Szuch and Patricia Hayden Kurt, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Mark Rhodes, appeals the judgment of the Wood County Court

of Common Pleas, Domestic Relations Division, denying his motions for a reallocation of

parental rights and responsibilities and to modify child support.  Appellee, Tonya Short,

has not filed a brief in response.  For the reasons that follow, we affirm.

**I.  Facts and Procedural Background**

{¶ 2} On January 22, 2015, the parties entered into a consent judgment entry of

divorce.  In the consent entry, appellee was designated the residential parent and legal

custodian of the two minor children, L.R. (born in 2007), and E.R. (born in 2010). Appellant was granted parenting time with the children for three evenings each week, as well as Friday overnight, and alternating weekends. Appellant was also ordered to pay $1,600 per month in child support.

## A. History of Post-Divorce Litigation

{¶ 3} On July 18, 2016, appellant reopened the case by filing a motion to show cause, and for a reallocation of parental rights and responsibilities. In his motion, appellant alleged that appellee had begun a new job which made the previous parenting schedule impractical. Appellant also alleged that appellee had unilaterally curtailed his parenting time with the children. Appellee responded by also seeking certain modifications to the parenting schedule.

{¶ 4} The hearing on appellant's motions was vacated and rescheduled several times, and was ultimately held on June 9 and August 17, 2017. During the intervening period, the parties filed additional motions including motions to show cause, to relocate the children, and to prevent the children from being dis-enrolled from a particular school, among others.

{¶ 5} Following the hearing, the magistrate found that appellee unilaterally deprived appellant of parenting time on numerous occasions. Appellee also unilaterally withdrew the children from the private school they had been attending, and enrolled them in public school. Records from the private school show that the children were tardy approximately 25 days, and absent 7 days over the course of the 2015-2016 school year, all of which occurred while appellee was responsible for the children. Around April

2.

2017, the guardian ad litem recommended that the parties try a "week-on/week-off" schedule with a midweek overnight visit. Following the end of the 2016-2017 school year, appellee unilaterally suspended the midweek overnight visits. At the hearing, appellee stated that she could not remember exercising midweek overnight visits after the parties started the "week-on/week-off" schedule, which the magistrate found not credible since the parties had exercised midweek visits for approximately five weeks in April and May 2017.

{¶ 6} The magistrate also found that appellee had filed for a domestic violence civil protection order against appellant, and included the children as desired protected persons. Appellee's petition listed several dates on which appellant was at her house, but the magistrate found that appellant had legitimate reasons involving his parenting time for being there, noting that appellant could have handled some of the times better to avoid upsetting appellee. In addition, the magistrate found that appellee had contacted appellant's pastor to make disparaging remarks about appellant. The magistrate also found that after a referral to children's services about appellee's boyfriend, appellee decided to have a police escort attend all exchanges of the minor children, which she claimed was necessary to protect her safety, and was not a retaliatory action. Finally, the magistrate found that both parties had made inappropriate comments to the children about the pending case.

{¶ 7} In light of her findings, the magistrate ordered that there was no change of circumstances to cause the court to modify the residential parent status. However, the magistrate ordered that the parenting time should be modified so that the parties alternate

3.

weeks of parenting time with the children, with exchanges to occur on Fridays at 5:15 p.m. The magistrate further ordered that the parties shall encourage frequent phone contact with the other parent, and to allow video-call access at least two times per week. As to child support, the magistrate ordered that appellant shall be responsible to pay the sum of $600 per month. On January 5, 2018, the trial court denied the parties' respective objections, and affirmed and adopted the magistrate's decision.

{¶ 8} On June 15, 2018, appellee reopened the case, seeking to modify the parties' parenting times surrounding the Wood County Fair and other holidays. Additionally, appellee alleged that appellant was not complying with the requirement of video-calls two times per week, and that appellant was not allowing the children to wear and use their phone watches to freely contact appellee. Furthermore, appellee alleged that appellant was making "nasty remarks" when the children wanted to contact appellee, and that appellant yelled at the children, thereby intimidating the children into not wanting to call appellee. Appellee subsequently supplemented her motion five times with additional complaints regarding appellant's availability to be home when the children return from school, appellant's inability or unwillingness to hire a babysitter, and appellant's move to within a block from appellee's home and his desire to send the children to appellee's house after school which would require appellee to expend her own funds to hire a babysitter.

{¶ 9} Appellant responded to appellee's motions by filing a motion to reallocate the parental rights and responsibilities, as well as subsequent motions to show cause. In his motions, appellant alleged that appellee's behavior has become increasingly erratic,

4.

and that she has attempted to alienate the children from him and has failed to properly care for the children by not providing adequate meals. Appellant also alleged that appellee signed the children up for extracurricular activities without first consulting him in violation of the most recent court order, that she denies the children access to their phones to contact appellant, and that she refuses to allow L.R. to ride the bus from school to appellant's home and interferes with his parenting time by picking L.R. up from school. Furthermore, appellant alleged that appellee confiscated electronic devices that appellant had purchased for the children and refused to return them to appellant. Finally, appellant alleged that appellee was not paying her share of the medical expenses.

{¶ 10} Following a February 6, 2019 hearing on this round of motions, the magistrate found that although there was still tension between the parties, the relationship "seem[ed] to have improved somewhat," and the children were doing relatively well. Based upon the guardian ad litem report and her in-camera discussions with the children, the magistrate found that the "week-on/week-off" schedule was too long, and since the parties were now living on the same street, it would be easier for the children to travel between the two homes. Additionally, the magistrate found that appellant has undermined appellee's decisions to the children, has not been respectful towards appellee's feelings, and has exhibited a desire to not allow the children to see appellee during his parenting time. The magistrate also found, on the other hand, that appellee has at times evidenced interference and a lack of cooperation. The magistrate exhorted the parties to work together to resolve issues and act in the best interests of the children.

5.

{¶ 11} In light of her findings, the magistrate ordered that appellee continue as the residential parent, and that the parenting time should be divided based on a "2-2-3" schedule. The magistrate further ordered that appellant pay $509.66 per month in child support. Both parties objected to the magistrate's decision, and on May 10, 2019, the trial court denied their objections and affirmed and adopted the magistrate's decision.

### B. Current Post-Divorce Litigation

{¶ 12} Three weeks later, on May 31, 2019, appellee reopened the case by filing a motion to show cause in which she alleged that appellant has been withholding the children from her in violation of the terms of the parenting schedule.

{¶ 13} On June 19, 2019, appellant responded by filing a motion for reallocation of parental rights and responsibilities and other relief. In his motion, appellant alleged that there has been a change of circumstances in that the children have on numerous occasions refused to visit with appellee. Appellant further alleged that while he has encouraged both children to respect and visit with appellee, he is reluctant to force the children to go with appellee given appellee's history of making domestic violence allegations and her litigious nature.

{¶ 14} The matter came to be heard before the magistrate on September 23, and October 23, 2019.

{¶ 15} At the hearing, appellee testified regarding the timeline of events. Appellee testified that March 18, 2019, was the last time that she had seen E.R. being herself, i.e., smiling, hugging, interacting, and telling appellee that she loves her. Appellee described that since that date, E.R. has had a flat affect, does not show emotion, and does not want

6.

to look at appellee. Appellee explained that a short time before, appellant had moved into the neighborhood, approximately 600 feet from appellee's house. Appellee testified that she was concerned that the children would ride their bikes or scooters in front of her house and not even look at her house, and if appellee was outside the children would not interact with her. Thinking that this behavior was not healthy for the children, appellee decided to move two miles away. It was during the process of putting the house up for sale and moving that E.R.'s behavior changed. Appellee did not move until May 2019.

{¶ 16} On March 29, 2019, E.R. became upset at appellee and ran away to appellant's house. Appellee testified that E.R. was upset that she had to pick up her room and pack, and that they could not have a bonfire that night. Appellee stated that appellant held E.R. at his house for one and one-half hours. Eventually, with the help of the Bowling Green Police Department, E.R. returned to appellee's house and things settled down.

{¶ 17} The next day, March 30, 2019, appellee took the children to Columbus, Ohio, where appellee met a friend at the hotel bar/restaurant while the children remained in the hotel room. Appellee testified that the friend was known to the children, and had a child that had gone through some similar issues as E.R. Appellee stated that the children had a great time in Columbus, and expressed that they did not want the weekend to end.

{¶ 18} Appellee testified that at the next scheduled exchange, appellant held the kids from her, so that she did not see them for five days. Then, during the period of April 4 through April 11, 2019, appellant arranged for E.R. to be driven in a car to the bus stop in front of appellee's house, where E.R. remained in the car until the moment that the bus

7.

arrived. Appellee testified that she believed this was done so that she could not go out and say hello or good morning to E.R. Several videos of these incidents were recorded by appellee and played at the hearing.

{¶ 19} On April 8, 2019, appellee picked up the children for her parenting time at the baseball field during L.R.'s practice. Appellee recorded the exchange. Although the audio in the recording is hard to hear, appellee testified that when she asked E.R. to get L.R.'s belongings from appellant's truck, appellant commented to E.R. that "your mom just wants [L.R.]'s stuff so he doesn't have to come back to me and say goodbye." Further, when appellee told E.R. that it was time to leave, appellant stated to E.R. that "your mom just wants you to go so that she can take you away from me." Appellee then left with E.R. to find E.R.'s missing smart watch while L.R. was still at baseball practice. The watch was at an address near appellant's house, but appellee did not realize it was the house immediately next door to appellant's house. When they could not find the watch, E.R. stated that maybe it was in appellant's house, and so she went in to look for it. But once E.R. went into the house she shut the blinds and closed the door and refused to come out. E.R. then called appellant. After 15 or 20 minutes, appellee messaged appellant that E.R. was in his house, and that she was going to return to the baseball field to pick up L.R. and then come back to get E.R. for her parenting time. When appellee came back to the house, E.R. came out to the car twice and asked if they were going to watch a movie that night. When appellee said no, that it was a school night and it was too late, E.R. returned to appellant's house. The third time that E.R. came out, she took

8.

her belongings from appellee's vehicle and went back into appellant's house and did not come back out. Appellee took L.R. and had her parenting time with just him.

{¶ 20} On April 12, 2019, a similar scenario occurred where E.R. came to the car but ultimately refused to go with appellee, and so appellee had her parenting time with just L.R. Appellee testified that the next morning, April 13, 2019, the children had an appointment with a counselor, but appellant did not bring E.R. to the appointment.

{¶ 21} On April 17, 2019, L.R. notified appellee that they would not be coming for her parenting time that night. Appellee testified that L.R. told her that appellant was putting pressure on him, and making it difficult for him.

{¶ 22} On April 22, 2019, the exchange was to take place at the baseball fields. Appellee testified that all of the cars were in a line, and that her car was several cars in front of appellant's truck. Appellee observed E.R. sneak up to her car and put her hand on the door handle, but then back away to appellant's truck. On the third time, E.R. opened the door to appellee's car, and told appellee that she was not coming. Appellee again had her parenting time with just L.R.

{¶ 23} On April 24, 2019, while it was still during appellee's scheduled parenting time, the school called appellee and told her that E.R. was sick with a fever and needed to go home. Appellee went to the school to pick up E.R. When appellee arrived, E.R. refused to go with her, despite encouragement to do so from her principal, teacher, and two guidance counselors. Ultimately, the school contacted appellant and he came to get E.R. While they were waiting, E.R. calmed down and had a good conversation with appellee. At the end of the conversation, they hugged, and expressed love for each other.

9.

{¶ 24} On April 26, 2019, appellee arrived for the exchange. E.R. came out to the car, and as she had done previously, asked if they were going to a movie. When appellee responded that they were not, E.R. said that she was not going to go with appellee, and went back into appellant's house.

{¶ 25} The next morning, April 27, 2019, E.R. went with appellee from the baseball field and had breakfast with appellee and L.R. E.R. then went home with appellee. At home, E.R. was looking for something that appellee had already packed to move, and appellee told her that they would find it once they moved to the new house. E.R. then wanted to jump on the trampoline, and appellee informed her that she would jump with her after she finished mowing the grass. While appellee was mowing, E.R. came outside and asked her if she could ride her bike over to appellant's house. Appellee asked E.R. if she was going to go and not come back, to which E.R. replied "No." Appellee then told E.R. to go over for 15 minutes, and they hugged and E.R. left. E.R. did not return to appellee's house. The next day, E.R. returned to gather her things, but did not stay for the rest of appellee's parenting time even though she was being encouraged to do so by appellee and L.R.

{¶ 26} On May 1, 2019, appellee did not have any parenting time with E.R., and E.R. did not even come out to speak with her. The same thing happened on May 6 and May 10, 2019.

{¶ 27} On May 13, 2019, appellant picked up L.R. from appellee's house. Shortly thereafter, L.R. ran back to appellee's house upset and crying. L.R. told appellee that he had said to appellant that he was excited about picking out a room at appellee's new

10.

house, to which appellant allegedly responded "if you're that happy about moving away from me, go back to your mom's, I don't want you here." Appellee consoled L.R. over dinner, and after he was calm, returned him to appellant.

{¶ 28} Appellee testified that she did not have any parenting time with E.R. on May 15, May 24, May 29, June 3, and June 7, 2019.

{¶ 29} On June 9, 2019, E.R. text messaged appellee while appellee was at church. E.R. stated that she wanted to go with appellee to go shopping for Father's Day and to pick out her things for an upcoming 4-H camp. Appellee messaged back that she already had plans to visit her parents in Defiance, Ohio, and that she wished that E.R. would join her. Appellee told E.R. that she was unable to take her shopping and drop her back off at appellant's house. Appellee messaged E.R. to tell her that she loved her and missed her. But the next day, E.R. stated that she never received the message.

{¶ 30} On June 12, 2019, appellee again had parenting time with L.R., but not E.R.

{¶ 31} On June 22, 2019, appellee had parenting time with L.R. Two days earlier, appellant demanded to have both kids on June 22 so that they could attend a cousin's birthday party. Appellee noted that L.R. had a 4-H obligation earlier in the afternoon, then was playing with the neighborhood kids, and later they were going to have a cookout and bonfire. Because of this, appellee told appellant that L.R. would not be able to go to the cousin's birthday party. Nevertheless, appellant arrived at appellee's house and yelled for L.R. to come. Appellant also sent E.R. to persuade L.R. to come, and both of them attempted to make L.R. feel guilty for not going.

11.

{¶ 32} On June 26, 2019, appellee arrived at 4-H for "rabbit ID day" with her boyfriend. Appellee's parenting time with the children began at 6:00. The boyfriend videotaped an interaction where appellee was helping E.R. fill out the paperwork for her rabbit, during which appellant approached and told them to hurry up. Appellee testified that appellant had already approached two or three times before that, despite court orders to not approach each other in public. After the rabbit was checked in, E.R. informed appellee that she was not going with appellee for appellee's parenting time.

{¶ 33} Appellee continued to not have parenting time with E.R. through July 12, 2019. Appellee testified that during that time, appellant did not encourage or assist E.R. in completing the tasks necessary to show her rabbit at the county fair. Instead, appellee received notification that E.R. was not going to do her rabbit project.

{¶ 34} On July 12, 2019, the counselor had arranged a dinner for E.R., L.R., and appellee during appellee's parenting time. Appellee initially expressed doubt that she would be available for the dinner given the various 4-H and baseball commitments, but ultimately decided to leave work early so that she could carve out 45 minutes for dinner. Appellee testified that appellant was 15 minutes late bringing E.R. to the dinner, despite knowing that they were on a tight schedule. As soon as appellee walked out of the restaurant after dinner, appellant was sitting there on the bench and left with E.R. Appellee testified that she was not given time to say goodbye to E.R., or hug or kiss her.

{¶ 35} According to appellee, after the dinner on July 12, 2019, appellant did not allow appellee to have her next parenting time with the children beginning July 15, 2019. Appellee testified that appellant informed her that the children did not want to go with

12.

her.  The children did not even come out to appellee's car to say hello.  Later, appellee learned that appellant had taken the children with him to his sister's house for that week.

{¶ 36} Appellee also described difficulties surrounding the county fair schedule. Appellee testified that appellant did not abide by the court order regarding the fair and deprived her of two and one-half days of parenting time.  In addition, appellee testified that appellant was yelling and attempted to engage in a confrontation with her boyfriend during one of the exchanges at the fairgrounds.

{¶ 37} On August 7, 2019, the parties went back to court, and at the hearing it was decided that exchanges would take place at the library going forward.  Appellee's understanding was that there was to be a 10 minute delay between the person dropping the children off, and the person picking the children up.

{¶ 38} The first exchange at the library took place on August 9, 2019.  Appellee testified that E.R. was "stand-offish," and that she did not want to interact with appellee. Appellee tried to encourage her to pick out a book for an upcoming vacation that E.R. had been excited about only a few days earlier, but E.R. ignored her.  E.R. then told appellee that she was not going with her for appellee's parenting time.  In refusing to go, E.R. stated that she did not have to listen to the counselor or the guardian ad litem.  The guardian ad litem, who was present to supervise the exchange, tried to encourage E.R. to go with appellee, but E.R. ran and locked herself in the bathroom.  Eventually, the guardian ad litem contacted appellant to pick up E.R.

{¶ 39} Appellee testified that she had a vacation planned for August 13 through August 19, 2019.  Appellee stated that the court orders allowed for a week of vacation if

13.

they were going out of town, and that the other parent was to get an itinerary for the trip. Appellee testified that she told appellant that she was going to allow the children to decide whether they wanted to go to Toledo or Findlay for ice cream on the night of August 13, 2019, and when they decided she would let appellant know. Appellant refused to allow the children to go with appellee.

{¶ 40} On August 14, 2019, appellee celebrated her birthday. Appellee testified that the court orders provided that appellee would have the children from 5:00 – 9:00 p.m. on her birthday. Appellee waited at the library for 15 or 30 minutes, messaged appellant, and then went home. After about an hour, appellee checked her messages and saw that appellant had replied, "I'm sorry, I forgot it was your birthday." Appellee responded and asked if he was not going to give her the kids for her parenting time, her vacation, or her birthday, why has he not even allowed the kids to call her. A few minutes later, appellee received a phone call from L.R., who said that they were at the library and wanted to know where appellee was. When appellee arrived at the library, she found out that the children had been waiting for one and one-half hours. During the time with the children at the library, appellee had a conversation with E.R. about going on vacation, and how she wanted E.R. to come with her. L.R. also tried to convince E.R. to come on vacation. After the 45-minute conversation, appellee felt like E.R. was just being manipulative, and so she became more direct with E.R. and told her that she could walk politely and respectfully to the car, or appellee could take her by the hand and walk her to the car, and if E.R. threw a temper tantrum and fell to the ground and flailed she would only embarrass herself. Appellee testified that E.R. agreed to come to the car.

14.

After they were outside, E.R. returned to the front of the library to get a paper that she had been coloring. Appellee testified that appellant must have honked his horn or flashed his lights to signal to E.R. because she then refused to come, and bolted across the road to appellant's truck. Appellant refused to return E.R. Ultimately, appellee went on vacation with L.R.

{¶ 41} On August 26, 2019, the exchange for appellee's parenting time was scheduled to occur at the same time as L.R.'s soccer practice. Appellee told appellant that since he did not want to do the exchange before the soccer practice, she would be at the library to pick up the children at 8:00 after practice. Appellant refused to bring the children to the library, but instead had L.R. call appellee from the soccer field to ask her where she was. L.R. was frustrated that appellee would not pick him up at the soccer field. Appellee did not have parenting time with the children that night. The next morning, appellee met L.R. at the bus stop, and explained to him that she wanted to do the exchange at the library—as had been agreed in court—because at least then she could see E.R. for 10 or 15 minutes, whereas if the exchange was at the soccer field, she would not have gotten to spend any time with E.R. Appellee then asked L.R. if he wanted to come for the rest of appellee's parenting time, and he said no, "dad won't do it." Appellee did not have any of her parenting time with the children on August 26 and 27, 2019.

{¶ 42} On August 30, 2019, appellee met at the library to pick up the children for an extended Labor Day weekend. After 15 minutes of speaking with E.R. and L.R.,

15.

appellee told E.R. that it was time to leave. E.R. responded that she was not going and ran out of the library, across the road, and directly to appellant's vehicle.

{¶ 43} On September 9, 2019, appellant again refused to meet appellee at the library either before or after soccer practice. Appellant informed appellee that if she did not show up at the soccer field then she was forfeiting her parenting time with the children.

{¶ 44} On September 13, 2019, appellant was late for the exchange at the library. When appellant arrived, E.R. left his vehicle, walked into the entrance to the library, and yelled down the hall that she was not coming. E.R. then got back into appellant's truck and they left. Appellee had her parenting time with L.R. A similar scenario unfolded on September 18, 2019.

{¶ 45} Finally, appellee testified as a general matter that appellant did not consistently bring the children to counseling appointments in that they missed four out of six visits, that he did not cooperate with her on getting information from the children's school, and that he does not work with her to enforce consistent discipline of the children.

{¶ 46} Appellant testified next. Appellant testified that appellee contacted the Bowling Green Police Department to oversee the exchanges in March 2019, and that the police presence upset the children. Regarding the March 29, 2019 incident where E.R. ran away from appellee's house, appellant testified that appellee was yelling and screaming at E.R. and raised her hand with her phone in it as if she was going to strike E.R., which scared E.R. and caused her to run. Appellant testified multiple times that E.R. is afraid of appellee.

16.

**{¶ 47}** Appellant also testified generally that he speaks with E.R. all the time trying to convince her to go with appellee, and trying to explain to her that she is missing out on making memories with her mother. Appellant further described an incident in April where he messaged appellee and offered a suggestion on a time that appellee could speak with E.R. during one of L.R.'s baseball games. However, appellee did not get the message in time because she does not get phone notifications. Appellant testified that he and L.R. both try to convince E.R. to go with appellee, but that their efforts upset E.R. Appellant explained that he does not want to force E.R. to go because appellee has tried to convince the children that he is a monster or an evil-person, and he feels that if he forced E.R. to go he would be playing into appellee's description of him. In addition, appellant is concerned that if he physically forced E.R. to go with appellee, that he would be accused of child abuse.

**{¶ 48}** Appellant testified that he believed it was in E.R.'s best interest to spend time with appellee, and that he has never disparaged appellee to the children. Appellant testified that he has never told the children that they cannot interact with appellee at practices or games, and in fact has encouraged E.R. to go over and say hello to appellee. Appellant also encourages the children to call appellee during his parenting time.

**{¶ 49}** Appellant next testified that appellee does not attend all of the children's baseball and soccer practices. He stated that the children have remarked that appellee "has no interest in what we do." Appellant, on the other hand, attends all of their practices, even those that occur during appellee's parenting time. Appellant testified that frequently appellee will have a coach or another parent transport L.R. to and from games,

17.

despite the fact that appellant is present and able to transport L.R. Appellant explained that L.R. is embarrassed by this, and to appellant it is an example of appellee not wanting to spend time with her children. Appellant also testified regarding the times that appellee has left the children alone, highlighting the night in the Columbus hotel room and a time when L.R. was left at the fairgrounds.

{¶ 50} As to appointments with the counselor, appellant testified that the children have missed three appointments. On two of those occasions, appellant only found out about the appointment on the day of the appointment. On the third occasion, the appointment was the same day as when E.R. was sent home from school for being sick. Other than those, appellant testified that the children have been seeing the counselor every two weeks for a total of approximately nine appointments.

{¶ 51} On the subject of the exchanges at the library, appellant testified that on August 14, 2019, he took the kids to the library shortly before 6:00, not remembering that it was appellee's birthday and that he should have delivered the children at 5:00. Appellant dropped off the children and then went home. Over an hour later, he received a call from L.R. that appellee was not there to pick them up. Appellant then had L.R. contact appellee. Appellant testified that after that night, he informed the children that he would not leave until he knew that they were going with appellee. He denied, however, that he ever told or signaled E.R. to come back to his truck.

{¶ 52} Appellant next testified regarding his interaction with the guardian ad litem. Appellant stated that although the guardian ad litem has been on the case for a long time, he has not spent much time in the last two rounds of litigation. Appellant

18.

testified that the guardian has only observed him with the children one time, which was at the August 9, 2019 exchange at the library, and that the guardian has never observed the children at appellant's house. Appellant also testified that the guardian did not interview L.R. before filing his report. Appellant noted that the children wrote letters to the guardian because they wanted to talk to him but he did not have the time. Appellant explained that the children do not feel like their voices are being heard.

{¶ 53} Finally, appellant testified that he believes there has been a change in circumstances in that once he moved into his new house, appellee told the children that it was not healthy or safe to live in that neighborhood and she decided to move again. Appellant also noted that appellee constantly has boyfriends around. Appellant feels that it is in E.R.'s best interest to stay with him and work on spending time with appellee. Appellant testified that E.R. feels safe at his house, but does not feel safe with appellee, and although L.R. is comfortable going back and forth, appellant testified that he thought it would be best for the children to remain together. Appellant testified that he is willing to co-parent with appellee, but it is difficult when she is constantly telling the children that he is abusive and threatening.

{¶ 54} The matter was then continued to October 23, 2019, for the rest of the hearing. Appellant testified that during the intervening time, L.R. had a scooter accident on a Saturday during appellant's parenting time, which resulted in L.R. chipping his front teeth. Appellant took L.R. to an emergency after-hours dentist visit, at which the dentist decided that it would be best to wait until Monday to try to do a permanent repair. On Monday morning, the dentist was unable to repair the teeth because L.R. would not let

19.

the dentist numb his mouth. The dentist recommended a pediatric dentist that could see L.R. that afternoon. At 10:00 a.m., appellee messaged appellant that appellant was to remain quiet, not approach her, and was to remain in the waiting room during the pediatric dentist appointment. If appellant did not agree to those conditions by noon, then appellee would cancel the appointment. Appellant testified that appellee ultimately cancelled the appointment, and L.R.'s teeth were not fixed until Wednesday.

{¶ 55} Appellant testified that as a result of the cancellation, L.R. experienced embarrassment at school as a result of his chipped teeth, he could not participate in a band performance because playing the trumpet put too much pressure on the front of his teeth and mouth, and he missed a field trip on Wednesday because he had to go to the rescheduled dentist appointment.

{¶ 56} Appellant testified that since the dental ordeal on October 5, 2019, L.R. has refused to go with appellee for her parenting time. Appellant explained that L.R. viewed the situation as appellee putting herself before him and his needs of getting his teeth fixed.

{¶ 57} Appellant also testified that on October 14, 2019, appellee contacted him to take the children's pets because they are taking up space in her garage, and if he did not, then she would give the pets away. Appellant felt the threat to give the pets away was mental abuse and an attack on the children's emotions.

{¶ 58} Appellant next testified that appellee did not show up for the exchange at the library on October 21, 2019.

20.

{¶ 59} Appellant then described several bills and expenses for the children that he alleged appellee has not paid.

{¶ 60} Finally, appellant testified that the children are not currently in counseling, but that he believes that they should be in counseling. However, appellant stated that he is not allowed to make appointments for them.

{¶ 61} The only other witness to testify at the hearing was the guardian ad litem. The guardian concluded that it was in the children's best interests to maintain the current arrangement with appellee as the residential parent and both parents splitting parenting time on the "2-2-3" schedule.

{¶ 62} The guardian spoke about E.R.'s issues with visiting appellee, and commented that based upon his interactions with her, he does not perceive that E.R. is afraid of appellee or is unsafe with her. The guardian noted that during the first library exchange, E.R. was sitting with appellee and talking and interacting with her in a positive manner. It was only when it came time to leave that E.R.'s mood changed and she became "stone-faced" and said that she did not want to go with appellee. The guardian believed that the issue with E.R. could have been more easily resolved at the beginning, but because it has been going on for months, it presented a much more difficult challenge. The guardian explained that he believed appellant could have been firmer with E.R. in the beginning, and could have worked with appellee and E.R. to restore E.R.'s relationship with appellee.

{¶ 63} The guardian also testified that the children hear a lot of negative information from appellant and appellee about the other parent, including information

21.

about the other parent's compliance or non-compliance with court orders. The guardian explained that one of the concerns of the counselor was that the children felt a need to protect appellant emotionally because they disclosed to the counselor that appellant would cry when they leave. The guardian further noted that it was a significant problem when appellee explained to the children that she was moving away from appellant because he made her feel unsafe.

{¶ 64} As to the letters sent to him by the children, the guardian expressed skepticism that the letters were written free of influence because they contained phrasing that he would not normally expect from children, such as "I want so and so to have custody so they can sign me up for activities."

{¶ 65} Based upon his interactions with the family, the guardian recommended that both parents need to engage in individual counseling and family counseling. He recommended that each parent should say something positive about the other parent to the children at least once a day. Lastly, the guardian recommended a parenting coordinator given the parents' history of being unable to work together to parent the children.

{¶ 66} Following the hearing, the magistrate determined that there had not been a change in circumstances to warrant a change in the residential parent. The magistrate ordered that the children shall resume their counseling and that the counselor shall implement a schedule to normalize the mother-child relationships, with the goal of resuming the full parenting schedule in three months. The magistrate further ordered that each parent shall make a positive statement about the other parent each day that the

22.

children are with him or her, and ensure that the children have a picture of the other parent in his or her room.

{¶ 67} Appellant objected to the magistrate's decision. On August 31, 2020, the trial court overruled appellant's objections and approved and adopted the magistrate's decision.

## II. Assignments of Error

{¶ 68} Appellant has timely appealed the trial court's August 31, 2020 judgment, and now asserts five assignments of error for our review:

1. The trial court abused its discretion when it neglected to find a change of circumstances to warrant a change in the residential parent from [appellee] to [appellant].

2. The trial court abused its discretion when it neglected to find a change of circumstances before issuing numerous orders that modified the then-existing orders relating to the parties' two minor children, to wit: [L.R.] and [E.R.].

3. The trial court abused its discretion when it accepted and relied upon a Guardian ad Litem Report and Recommendation although the Guardian failed to carry out numerous responsibilities set forth in Ohio Sup. R. 48(D).

4. The trial court abused its discretion when it neglected to modify the existing child support orders although there had been a clear and substantial change of circumstances. At the time of the trial, Appellant was

23.

acting as the children's primary caretaker and was paying for all of the children's ongoing expenses in addition to the full child support order to Appellee.

5. The trial court abused its discretion when it adopted a Magistrate's Decision that contained numerous Findings of Fact that were unsupported by the evidence on the record. Many of the facts relied upon by the magistrate were not presented at the trial.

### III. Analysis

{¶ 69} For ease of discussion, we will address appellant's assignments of error out of order. In his third and fifth assignments of error, appellant challenges the evidentiary and factual underpinnings supporting the trial court's conclusion that there was not a change in circumstances to warrant a change in the residential parent. In his first assignment of error, appellant challenges the trial court's conclusion itself. In his second assignment of error, appellant argues that the trial court erred in modifying the parental rights and responsibilities without finding a change of circumstances. Finally, in his fourth assignment of error, appellant argues that the trial court erred in failing to modify the child support order.

### A. Guardian Ad Litem

{¶ 70} In his third assignment of error, appellant argues that the trial court erred when it considered the guardian ad litem's report because the guardian failed to comply

with his responsibilities under Ohio Sup. R. 48, et seq.[1]  Specifically, appellant argues that the guardian failed:  to promptly notify the court as required by Sup. R. 48.03(A)(5) that his conclusion was in conflict with the children's wishes; to maintain independence, objectivity, and fairness as required by Sup. R. 48.03(A)(2); to meet, interview, and observe the children as required by Sup. R. 48.03(D); and to file a report no less than seven days before the hearing as required by Sup. R. 48.06(C)(1).

{¶ 71} "Appellate courts will not reverse trial court decisions to admit a guardian ad litem's testimony and recommendation unless the trial court abused its discretion." *In re T.C.*, 6th Dist. Lucas No. L-15-1106, 2015-Ohio-3665, ¶ 20, citing *Corey v. Corey*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, ¶ 9.  An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 72} Sup. R. 48, et seq., provides "good guidelines for the conduct of a guardian ad litem in meeting his or her responsibilities in representing the best interest of a child in order to provide the court with relevant information and an informed recommendation." *In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, ¶ 45 (8th Dist.), quoting *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334, 99335, 2013-Ohio-5239, ¶ 14.  However, the rules of superintendence are only general guidelines, and "do not create substantive rights in individuals or procedural law."  *Id.*, quoting *In re C.O.* at ¶ 14.  "As such, it has generally

---

[1] Appellant references Ohio Sup. R. 48(D), but subsequent to the filing of his brief, Sup. R. 48(D) has been amended and renumbered by the Ohio Supreme Court.  We will refer to the appropriate sections as renumbered.

been held that a guardian ad litem's failure to comply with Sup.R. 48 is not, in and of itself, grounds for reversal of a custody determination." *Id.*

{¶ 73} In *Nolan v. Nolan*, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, ¶ 26, the Fourth District held that the trial court abused its discretion in considering the guardian ad litem's report and recommendation where the guardian ad litem "fell so far below the minimum standards." In that case, the guardian ad litem failed to interview the mother's boyfriend—with whom the child would be living—failed to investigate the relevant details of the boyfriend's life, did not interview the child's half-sister, did not visit the residences of either parent, did not interview the child's school personnel or medical-health providers despite the child being diagnosed with ADHD and having behavioral issues, and did not meet with the child in a one-on-one setting. *Id.* at ¶ 25.

{¶ 74} Here, in contrast, the guardian ad litem was familiar with the family from his years of service as a guardian, spoke with the children's counselor, spoke with personnel at E.R.'s school, spoke with L.R., observed E.R. with appellant and appellee during an exchange at the library, had a walking interview with E.R. in an attempt to divert her attention so that he would get more organic responses from her, observed her with appellant in the waiting room of his office, and received letters from the children discussing their wishes. Therefore, we find the present case to be distinguishable from *Nolan*, and hold that the trial court did not abuse its discretion in considering the report and recommendation from the guardian ad litem. *See In re T.C.* at ¶ 23 (trial court did not abuse its discretion in considering guardian ad litem's testimony where the guardian

26.

testified at length as to the extent of her investigation and was subject to cross-examination by all parties).

{¶ 75} Accordingly, appellant's third assignment of error is not well-taken.

### B. Magistrate's Factual Findings

{¶ 76} In his fifth assignment of error, appellant challenges several of the magistrate's factual conclusions, which were adopted by the trial court, as not being supported by the evidence.

{¶ 77} First, appellant challenges the magistrate's findings that:

5. Father moved into Mother's neighborhood sometime in May of 2019.

6. Father is aware that Mother is uncomfortable around him, however he did not take that into consideration prior to moving around the corner from Mother. He refuses to acknowledge that Mother is uncomfortable around him because he does not feel that he has done anything to make her fear him. It is not clear if this is a control issue or a lack of empathy. He testified that he moved because he wanted the children to be able to go back and forth between the houses so that the parents could co-parent. Although that would be an ideal situation, and it sounds wonderful, it does not reflect the reality of the current situation.

{¶ 78} Appellant argues that the magistrate's findings were factually incorrect as the testimony revealed that he moved into his new home in February 2019, not May 2019. Further, he argues that the timing of the move is important because the close

27.

proximity of the parties was taken into consideration at a hearing on March 7, 2019, and because the subsequent events of E.R. running away and the children becoming upset at mother occurred because of appellee's comments that the neighborhood was no longer safe.

{¶ 79} We agree with appellant that the magistrate's finding that he moved into the neighborhood in May 2019 was factually incorrect. However, we do not find any prejudicial effect from this error, because although the magistrate may have been confused on the specific dates, the magistrate recognized the events and consequences in an appropriate timeline. Rather than ignore appellee's conduct and its impact on her relationship with the children, the magistrate later found,

23. Mother has done some things that have caused or contributed to the children's turmoil:

a. She made statements that it was unsafe and unhealthy when Father moved into the neighborhood. The children resented her for these comments.

b. As a result of Father's move, Mother decided that she had to move again, so she wasn't so close to Father. This move upset the children.

Therefore, we find the magistrate's error in the date that appellant moved into the neighborhood to be of no practical consequence.

{¶ 80} Second, appellant challenges the magistrate's findings that:

7. There is no evidence that the children are unsafe at either parent's home. On one occasion, [L.R.] left Father's home and did not want to

28.

return.  Mother handled it very well.  She made sure that Father was aware of [L.R.]'s location, she talked things through with [L.R.] and then had [L.R.] return to Father's home.

8.  On the other hand, [E.R.] left Mother's home on April 22, 2019, went to Father's home and never returned.  There is no indication that Father communicated with Mother or encouraged [E.R.] to return to Mother's.  Father claims he doesn't want to force [E.R.] to go where she does not feel safe.  Knowing that she would be safe at Mother's, he needs to reassure her that she will be safe, calm her down and send her back.

9.  [E.R.] has left Mother's home when Mother has corrected her about inappropriate behavior.  Instead of trying to learn the cause of the interrupted parenting time and reinforcing the importance of good behavior, Father reinforced [E.R.]'s avoidance and poor behavior of running away and this can lead to manipulative behavior.  As a parent, there are many occasions when it is necessary to "force" something on a child such as medicine or going to school.  It is not a negative.

{¶ 81} Appellant disagrees with the magistrate's finding that appellee's home is not unsafe.  Appellant points to the fact that E.R. was allowed to run away twice, and the fact that appellee left E.R. unsupervised at appellant's home on one occasion as evidence of clear safety risks.  Furthermore, appellant argues that forcing the children to visit with appellee against their will, and when they have stated that they do not feel safe with appellee, perpetuates the ongoing risk to the children's health.  Appellant notes that E.R.

29.

stated in her letter to the guardian ad litem that appellee "gets very angry and yells too much."

{¶ 82} In addition, appellant argues that there is no evidence that he reinforced E.R's behavior in running away, and identifies that he was not home on either occasion that she ran away. Furthermore, appellant testified about his efforts to encourage the children to visit and communicate with appellee. Lastly, appellant highlights that he does not "force" E.R. to visit with appellee because E.R. does not feel safe at appellee's house, and because appellee has previously accused him of domestic violence and child abuse and he believes that if he forced E.R. to visit, he would face similar allegations.

{¶ 83} Upon review, we find that the magistrate's findings are supported by the evidence. Although running away from home obviously is concerning, there is no evidence that either child has been abused, neglected, or harmed at either home. To that end, the magistrate has implicitly concluded that to the extent that E.R. is afraid of appellee, that fear is irrational. Assuming that E.R. accurately reported that appellee raised her hand one time as if to strike E.R., there is no evidence that E.R. was ever actually struck. Appellant had an opportunity when he discussed the incident with E.R. to calm her and reassure her that she was safe with appellee, but appellant did not do so as evidenced by the fact that E.R. has since consistently refused to visit with appellee, claiming that she is afraid of her. Notably, the guardian ad litem testified that he does not believe that E.R. is afraid of appellee or is unsafe with her. Thus, E.R.'s persistent refusal to visit with appellee following a relatively minor incident supports the

30.

magistrate's conclusion that appellant is reinforcing E.R.'s avoidance of appellee and her poor behavior of running away.

{¶ 84} Appellant next challenges the magistrate's findings that:

12. Since picking up on Father's cues, [E.R] has now, on her own, adopted the attitude of not wanting to see Mother. Following are some examples:

a. She has gone to Mother's car on several occasions and told her that she was not going with Mother. At times this was because Mother told her it was too late to watch a movie or do something else.

b. On March 29, 2019, [E.R.] ran away from Mother's home. She was upset because she wanted to call Father. [E.R] stated Mother was yelling at her.

c. On April 24, 2019, Mother had planned to pick up [E.R.] at lunchtime to take her to lunch and then pick up [L.R.] from school, as they both had a counseling appointment at 4:30 pm. The school called Mother around 9:15 am and stated [E.R.] had a temperature of 101.8 and needed to be picked up from school. Mother went to the school to pick up [E.R.]. When she arrived, [E.R.] said hello and asked why she was there. [E.R.] stated that it was her dad's time. Mother told [E.R.], "No, it is not your dad's time," and asked her to get her things so they could go home. [E.R.] stated, "No, dad is to come and get me." [E.R.] stated that she needed to go to her classroom, as there was something she had forgotten. She went to

the classroom and called her dad.  [E.R.] then began crying and hyperventilating, stating that she did not want to go with Mother.  Both [E.R.]'s teacher and principal attempted to intervene and get [E.R.] to go with her mother.  After nearly an hour, [E.R.] calmed down but still would not leave with Mother.  Then, Father was called to come to get her.  After leaving, Mother sent a message to Father on Our Family Wizard informing him of the counseling appointment that day, but [E.R.] was not brought to the counseling appointment.

d. On April 27, 2019, [E.R.] ran away from Mother's home to Father's home.  Earlier that day, [E.R.] went to breakfast with [L.R.] and Mother.  At breakfast [E.R] went under the table and sat on the floor to let [L.R.] out of the booth.  Mother talked to [E.R.] about making good choices and reminded her that she is very aware that sitting on the floor under the table is not a good choice.  When [L.R.] returned, [E.R.] stood up at the corner of the table, not allowing [L.R.] enough room to get back to his seat.  [L.R.] asked [E.R.] two times to move, however, [E.R.] remained obstinate and did not move her foot.  [L.R.] tripped over [E.R.]'s foot getting back into the booth.  Mother then stated to [E.R.] if she continues this behavior and continues to not make good choices, she will get a consequence.  [E.R.] did not like to hear that and stated she did not know her foot was in the way.  When they returned home around 11:00 am, Mother felt she had to mow the lawn before it rained.  Mother told [E.R.] she would jump on the

trampoline with her after mowing. [E.R.] then asked where her slime kit was located, however it had been packed and Mother was unsure of its location. [E.R.] became upset, went upstairs, came down a few minutes later and asked to ride her bike to her dad's house to say hi. Mother asked [E.R.] if she was going to go to her dad's to not return and she said no she was only going to say hi. Mother had [E.R.] wear a Gizmo watch so that she would be able to call her. Mother asked [E.R.] to come back in 15 minutes and [E.R.] told her she would return at 12:05 pm. [E.R.] gave Mother a kiss and told her she loved her. [E.R.] did not return to Mother's home.

e. On August 9, 2019, the Guardian Ad Litem met the parties at the library. [E.R.] stated she was not going with Mother for her parenting time. [E.R.] stated that she did not have to listen to the Guardian Ad Litem or Ms. Kroniser. The Guardian Ad Litem eventually called Father to come back and pick up [E.R.] from the library after she locked herself in the bathroom.

{¶ 85} In his appellate brief, appellant takes issue with some minor discrepancies between the record and the magistrate's findings. For example, appellant argues that certain direct quotes do not exist in the record, nor does the record reflect that E.R. called appellant while she was sick at school. We find these discrepancies to be trivial. Moreover, our review of the record leads us to conclude that the salient points of the magistrate's findings are, in fact, supported by the record.

{¶ 86} More significantly, appellant argues that it is not fair to conclude that E.R. adopted an attitude of not wanting to visit appellee because she was "picking up on Father's clues." As alluded to above, this is not an unreasonable conclusion to reach. E.R. initially ran away from appellee's home on March 29, 2019, because she was upset that appellee was moving, and because she reportedly feared that appellee was going to strike her. Despite that, E.R. went with appellee the next day to Columbus, and had a good time. However, the record reflects that at the very next exchange, appellant denied appellee parenting time with the children. This appears to be a consistent pattern with appellant as the record shows that he denies appellee parenting time immediately after she is able to spend time with E.R. For example, in addition to the exchange following the trip to Columbus, appellant denied appellee her next parenting time after E.R. spent time with appellee on April 27, 2019, before she ran away, and after appellee's dinner with E.R. on July 12, 2019.

{¶ 87} Relatedly, the record shows that appellant has communicated to the children that he does not want them to leave him to go visit with appellee. At the April 8, 2019 exchange, appellant reportedly told E.R., "your mom just wants you to go so that she can take you away from me." On April 17, 2019, when L.R. informed appellee that they were not coming for her parenting time, L.R. allegedly stated that appellant was putting pressure on him and making it difficult on him. The children have also reported to their counselor that appellant cries when it is time for them to leave.

{¶ 88} Furthermore, appellant testified repeatedly that E.R. is afraid of appellee, but the guardian ad litem does not believe that to be the case. Upon review, the record in

34.

this case is replete with examples that suggest there may be a different motivation other than fear to explain why E.R. does not want to go with appellee for her parenting time. Early on, after the first running away incident, E.R. refused to go with appellee after learning that appellee was not going to let her watch movies. The second running away incident came after appellee told E.R. that she was not going to look for something that had been packed away, and that she would only jump on the trampoline with E.R. after she finished mowing the grass. Since then, E.R. has had multiple interactions with appellee whether at dinner, 4-H, or the library that have been positive until the moment that it is time to leave to go with appellee.

{¶ 89} We recognize that we are not counselors or medical professionals, and we do not attempt to diagnose E.R.'s motivation for not visiting appellee. We merely highlight these incidents to demonstrate that there is support for the magistrate's conclusion that appellant is influencing E.R.—whether intentionally or unintentionally—to maintain in her decision not to visit appellee. Thus, we do not find the magistrate's conclusion that E.R. is picking up on appellant's clues to be unsupported by the record.

{¶ 90} Finally, appellant contests the magistrate's findings that:

16. Father did not explain why Mother was not called after [the scooter accident where L.R. chipped his teeth] when he was working and Mother was at home. Instead, [L.R.] was with the babysitter since it was Father's parenting time. When one parent is available in this type of situation, that parent should be with the child. Instead, Father refuses to

give up his parenting time to Mother, even when he is not available and it would be best for the child.

17. On Monday, October 7, 2019, Father contacted the dentist's office at approximately 7:45 am. The office said that [L.R.] could be seen at 8:30 am, so Father took the children to the dentist's office to have [L.R.] seen. Father did not notify Mother, he testified that he was rushed to get to the office. Mother, who had also called the office in the morning, learned of the appointment and was also present for [L.R.]'s visit.

18. Because the pediatric dentist was not able to give [L.R.] nitrous oxide, a second appointment to fix [L.R.]'s teeth was scheduled for 3:00 pm later that same day (10/7/19) at another office.

19. Prior to the 3:00 pm dentist appointment on October 7, 2019, Mother sent Father a message via Our Family Wizard insisting that he conduct himself a certain way at the 3:00 pm appointment (e.g. "stay in the lobby," "stay quiet and not approach me," and stay out of the room where [L.R.] will be treated). Mother stated that, if Father did not confirm by noon that he would comply with these rules, she would cancel the 3:00 pm appointment to fix [L.R.]'s teeth. Father viewed these as demands from Mother that he did not have to follow, but Mother testified that these were the doctor's rules.

36.

20. Ultimately Mother did cancel the appointment.

21. [L.R.] was not able to participate in his band concert on Tuesday October 8, 2019 and he had to miss a field trip on Wednesday. Father let [L.R.] know that Mother cancelled the appointment so now the children and Father are all blaming Mother.

22. Father kept [E.R.] out of school on Monday to take her to the dentist with [L.R.]. He testified that he did that because he did not know how long it would take and whether he would be available to pick [E.R.] up from school. There was no reason for [E.R.] to miss school; this is an example of his lack of acknowledgment that the children have two parents who can work together to accommodate both children.

{¶ 91} Appellant argues that the magistrate's decision was wrong in two respects. First, appellant argues that the magistrate erroneously found that he did not explain why he did not contact appellee after the scooter accident. Appellant stated that L.R. required immediate medical attention, and appellant was able to make that appointment. He then notified appellee of the incident later that night. The magistrate's point, however, was that in that situation it may have made more sense for appellee to respond to the injury because appellant was at work. The fact that appellant did not have appellee contacted was just an example of his unwillingness to truly co-parent the child.

{¶ 92} Second, appellant contests the magistrate's finding that "Mother testified that these were the doctor's rules." Appellant argues that appellee's assertion that the dentist's office created those rules lacked all credibility. However, the magistrate's

37.

finding was factually correct. Notably, the magistrate did not make a finding whether or not the rules were created by the dentist's office, but instead recounted what each party said.

{¶ 93} Appellant further criticized the magistrate for not reprimanding appellee for cancelling the dentist appointment. The extent to which the magistrate specifically considered appellee's cancellation of the dentist appointment is unclear, but it suffices to say that the magistrate recognized that "Mother has done some things that have caused or contributed to the children's turmoil," and "There are numerous examples of both parties contributing to the conflict affecting the children." Thus, as with the above findings, the trial court's findings regarding the chipped-teeth incident are supported by the record.

{¶ 94} Accordingly, appellant's fifth assignment of error is not well-taken.

### C. Change of Circumstances

{¶ 95} In his first assignment of error, appellant argues that the trial court erred when it found that there was not a change of circumstances to warrant a change in the residential parent.

R.C. 3109.04(E)(1)(a) provides,

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve

38.

the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 96} "In determining whether a 'change' has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). "The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Id.* "This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Id.* at 419.

{¶ 97} In support of his assignment of error, appellant argues that there has been a clear change of circumstances, as evidenced by the fact that E.R. stopped visiting with appellee in April 2019, and L.R. stopped visiting with appellee in October 2019. Appellant claims that the trial court ignored the new reality that he is effectively the sole caretaker for the children. In addition, appellant argues that the trial court failed to

consider that the children no longer wish to visit with appellee, that E.R. has run away from appellee's house on multiple occasions, that appellee has left the children unattended, that appellee failed to follow through on dental care for L.R., and that appellee told the children that she moved because she was afraid of appellant and he made their neighborhood unsafe.

{¶ 98} Upon our review, it is clear that the circumstances have changed in light of the fact that E.R. has not been visiting appellee since April 2019, and L.R. has not been visiting since October 2019. However, a change in circumstances is only a threshold determination, and the trial court should not modify the parental rights and responsibilities unless such a modification is in the children's best interests, and should not change the residential parent unless the harm caused by a change of environment is outweighed by the benefits from a change of environment. R.C. 3109.04(E)(1)(a). Here, although the trial court did not artfully word its decision in finding that there "has not been a change of circumstances *to warrant a change in the residential parent*," (emphasis added), we think it is clear that the trial court's decision was based on the best interests of the children and the potential harm to the children. Indeed, the trial court emphasized the harm to the children in its comments that "[appellee] and [appellant] are irresponsibly damaging their children during this war," that "a Parenting Coordinator is necessary to try and curb the sophomoric actions of both [appellee] and [appellant]," that "the parents don't even appear to marginally recognize the damage they are doing by showing the children how not to parent. [Appellant] in particular is letting [E.R.] run the show by

failing to enforce [appellee's] parenting time," and that "[appellant] is undermining counseling. The passive/aggressive actions are more fitting of a teenager, not a parent."

{¶ 99} As to the best interests of the children, appellant argues that the trial court did not conduct an analysis of the relevant factors under R.C. 3109.04(F)(1), which provides:

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) * * * [T]he wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

41.

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

* * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.

{¶ 100} Here, while the magistrate's decision does not expressly list the R.C. 3109.04(F)(1) factors, the decision itself demonstrates that consideration was given to each one. The magistrate's decision, as adopted by the trial court, contains nearly 12 pages of detailed findings touching on each of the relevant factors. Thus, we disagree with appellant's assertion that the trial court did not conduct a best interest analysis.

{¶ 101} In sum, the trial court found that there was not a change in circumstances warranting a change in the residential parent. Giving due deference to the trial court, and upon consideration of the evidence, including evidence which suggests that the children's desire to stop visiting appellee is at the least partly influenced by appellant's own conduct and that it would not be in the children's best interests to change the residential parent, we cannot say that the trial court's decision constitutes an abuse of discretion.

{¶ 102} Accordingly, appellant's first assignment of error is not well-taken.

## D. Change in Terms

{¶ 103} In his second assignment of error, appellant argues that the trial court erred by modifying the existing parenting orders without finding a change of circumstances.

{¶ 104} Appellant does not specify how the previous order was modified, but our comparison of the orders shows that in the August 31, 2020 judgment the trial court maintained appellee as the residential parent, and continued the parenting time schedule that had been previously ordered in the May 10, 2019 judgment entry. The trial court, however, did modify the May 10, 2019 judgment entry by eliminating the requirement that mother's vacation time does not have to occur out of town, and by requiring the itinerary to be provided no later than 12 hours before the start of the trip. Additionally, the trial court modified the May 10, 2019 judgment entry by requiring that exchanges take place at the library as opposed to curbside.

{¶ 105} Aside from those modifications, the trial court imposed additional requirements upon the parties that were not contained in the May 10, 2019 judgment entry. For example, the trial court ordered that the parties resume the children's counseling, and that both parents are to participate in counseling as recommended by the children's counselor. The court ordered that the counselor shall establish a schedule to normalize the mother-child relationship with the goal of resuming the court-ordered parenting time as soon as possible and within three months. The court appointed a parenting coordinator, and ordered the parties to participate in communication counseling as recommended by the parenting coordinator. The court ordered that if a parent has the

43.

children for three straight days, that parent must email the other parent describing at least one recent activity or saying something positive about each child. The court ordered the parties to ensure that the children have a picture of the other parent in their rooms. The court ordered that each parent make a positive statement about the other parent each day that the children are with him or her. Finally, the court ordered each parent to acknowledge his or her actions that have contributed to the current situation and work with the children to overcome the resistance.

{¶ 106} The question we are presented with is whether the modifications and additional requirements imposed by the court in its August 31, 2020 judgment entry constitute a modification of "a prior decree allocating parental rights and responsibilities for the care of children." R.C. 3109.04(E)(1)(a).[2] We hold that they do not.

{¶ 107} In *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 22, 26, the Ohio Supreme Court noted,

> "Parental rights and responsibilities" is not defined in the statute.
> However, a majority of this court commented that the General Assembly
> changed the terms "custody and control" to "parental rights and
> responsibilities" when it amended R.C. 3109.04 in 1991. *Braatz v. Braatz*
> (1999), 85 Ohio St.3d 40, 43, 706 N.E.2d 1218. "'"Custody" resides in the
> party or parties who have the right to ultimate legal and physical control of
> a child.'" *Id.* at 44, 706 N.E.2d 1218, quoting *In re Gibson* (1991), 61 Ohio

---

[2] There is no shared parenting decree in this case, so modification of the terms of a shared parenting plan under R.C. 3109.04(E)(2) is inapplicable.

44.

St.3d 168, 171 573 N.E.2d 1074. Therefore, parental rights and responsibilities reside in the party or parties who have the right to the ultimate legal and physical control of a child.

* * *

In summary, R.C. 3109.04(E)(1)(a) expressly provides for the modification of parental rights and responsibilities in a decree. An allocation of parental rights and responsibilities is a designation of the residential parent and legal custodian. Therefore, R.C. 3109.04(E)(1)(a) controls when a court modifies an order designating the residential parent and legal custodian.

{¶ 108} From the language in *Fisher*, we hold that a trial court does not modify an order allocating parental rights and responsibilities when it makes minor changes to the terms of a parent's vacation time or imposes additional conditions such as counseling or saying nice things about the other parent. Because those minor modifications and conditions do not change the residential parent designation or even alter the parenting time between the parties, we hold that the trial court was not required to first find a change of circumstances under R.C. 3109.04(E)(1)(a). Truly, if a "party requesting a change in visitation rights need make no showing that there has been a change in circumstances in order for the court to modify those rights," *Kelley v. Kelley*, 6th Dist. Wood No. WD-19-073, 2020-Ohio-1535, ¶ 34, quoting *Braatz v. Braatz*, 85 Ohio St.3d 40, 706 N.E.2d 1218 (1999), paragraph two of the syllabus, it follows that a change of circumstances likewise would not be required where the trial court imposes minor

45.

conditions such as counseling. This is particularly so in light of the purpose of R.C. 3109.04(E)(1)(a), which is to "spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment." *Davis*, 77 Ohio St.3d at 418, 674 N.E.2d 1159, quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416, 445 N.E.2d 1153 (10th Dist.1982).

{¶ 109} Accordingly, appellant's second assignment of error is not well-taken.

### E. Child Support

{¶ 110} In his fourth and final assignment of error, appellant argues that the trial court erred when it failed to modify his child support obligation.

{¶ 111} R.C. 3119.79(C) provides,

If the court determines that the amount of child support required to be paid under the child support order should be changed due to a substantial change of circumstances that was not contemplated at the time of the issuance of the original child support order or the last modification of the child support order, the court shall modify the amount of child support required to be paid under the child support order to comply with the schedule and the applicable worksheet, unless the court determines that those amounts calculated pursuant to the basic child support schedule and pursuant to the applicable worksheet would be unjust or inappropriate and

46.

therefore not in the best interest of the child and enters in the journal the figure, determination, and findings specified in section 3119.22 of the Revised Code.

"It is well established that a trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion." *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108 (1997); *Funkhouser v. Funkhouser*, 6th Dist. Erie No. E-18-039, 2019-Ohio-733, ¶ 31 ("We review a trial court's child support modification order for an abuse of discretion.").

{¶ 112} Appellant argues that the trial court's decision not to modify the child support orders was unreasonable and arbitrary where there was a change of circumstances resulting in appellant being the primary caregiver for E.R. beginning in April 2019, and for L.R. beginning in October 2019. As the primary caregiver, appellant states that he has incurred all of the children's expenses. He concludes that it is unjust and inequitable for him to also be required to pay child support to appellee.

{¶ 113} In this instance, we disagree. Although appellant claims a change of circumstances, the trial court did not find the changed circumstances to be desirable. Instead, the trial court entered orders that it hoped would resolve the issues between appellee and the children, and that would restore the original distribution of parenting time. In light of the trial court's goal of equal parenting time, and its efforts toward achieving that goal within three months, we hold that it was not an abuse of discretion for

47.

the trial court to maintain the current child support order, particularly where the trial court considered that appellant is at least partially responsible for the children refusing to visit appellee.

{¶ 114} Accordingly, appellant's fourth assignment of error is not well-taken.

## IV. Conclusion

{¶ 115} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Wood County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
                         JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, J.      _____
CONCUR.                      JUDGE

_____
                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.